# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## APPEAL NO. 22-1089

### ALMARIS SERRANO-COLON
Plaintiff-Appellant,

**v.**

### UNITED STATES DEPARTMENT OF HOMELAND SECURITY; RICHARD MALDONADO; ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,
Defendants-Appellees.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---

## BRIEF FOR APPELLEE

---

W. Stephen Muldrow
United States Attorney

Mariana E. Bauzá-Almonte
Assistant United States Attorney
Chief, Appellate Division

Francisco A. Besosa-Martínez
Assistant United States Attorney
U.S. Attorney's Office
Torre Chardón, Room 1201
350 Carlos Chardón Street
San Juan, Puerto Rico 00918
Tel. (787) 766-5656
Fax (787) 771-4050

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Jurisdictional Statement ............................................................ 1

Statement of the Issue on Appeal ................................................. 2

Statement of the Case ................................................................ 3

Summary of the Argument ......................................................... 23

Argument ................................................................................ 25

**I.   The district court properly granted the government's motion for summary judgment because the evidence did not establish a genuine issue of material fact as to any of Serrano's Title VII and preempted Rehabilitation Act claims, Serrano failed to establish a *prima-facie* case, and in any event failed to show the government's proffered reasons for termination were pretext.**

Issue ................................................................................. 25

Standard of Review ............................................................ 25

Discussion ........................................................................ 26

Conclusion ............................................................................. 69

Certificate of Compliance ........................................................ 70

Certificate of Service ............................................................... 71

## TABLE OF AUTHORITIES

## **FEDERAL CASES**

Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128 (1st Cir. 2012)........34

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ......................................26

Azimi v. Jordan's Meats, Inc., 456 F.3d 228 (1st Cir. 2006) ............................34

Bark v. United States Forest Serv., 37 F. Supp. 3d 41 (D.D.C. 2014)..............57

Benson v. Wal-Mart Stores E., L.P, 14 F.4th 13 (1st Cir. 2021).......................28

Borrell v. United States, 682 F.2d 981 (D.C. Cir. 1982)....................................60

Brader v. Biogen, Inc., 983 F.3d 39 (1st Cir. 2020) ...........................................34

Bragdon v. Abbott, 524 U.S. 624 (1998)..............................................................63

Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6 (1st Cir. 2004)............... 38, 67

Chadwick v. WellPoint, Inc., 561 F.3d 38 (1st Cir. 2009).................................27

Cham v. Station Operators, Inc., 685 F.3d 87 (1st Cir. 2012)...........................28

Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115 (9th Cir. 2000) ....27

Coleman v. Sec'y U.S. Dep't of Homeland Sec.,
    649 F. App'x 128 (3d Cir. 2016) ......................................................................41

Consejo de Desarrollo Economico de Mexicali, A.C. v. United States,
    482 F.3d 1157 (9th Cir. 2007)...........................................................................57

Conyers v. MSPB, 388 F.3d 1380 (Fed. Cir. 2004) ..................................... 41, 45

Conyers v. Rossides, 558 F.3d 137 (2d Cir. 2009) ............................................41

D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26 (1st Cir. 2012)....................67

Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216 (1st Cir. 2007)...........28

Durso v. Napolitano, 795 F. Supp. 2d 63 (D.D.C. 2011) ..................................39

Elgin v. Dep't of Treasury, 567 U.S. 1 (2012)....................................................43

Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572 (1st Cir. 1999) ...........37

Field v. Napolitano, 663 F.3d 505 (1st Cir. 2011) .................................. 38, 40-41

Filebark v. U.S. Dep't of Transp., 555 F.3d 1009 (D.C. Cir. 2009)...................43

Garside v. Osco Drug, Inc., 895 F.2d 46 (1st Cir. 1990)...................................36

Gerald v. Univ. of P.R., 707 F.3d 7 (1st Cir. 2013)............................................31

Gu v. Boston Police Dept., 312 F.3d 6 (1st Cir. 2002) .......................................67

Hui v. Castaneda, 559 U.S. 799 (2010)...............................................................52

In re Glacier Bay, 944 F.2d 577 (9th Cir. 1991) ............................................ 56-57

Irizarry v. United States, 427 F.3d 76 (1st Cir. 2005) .................................. 51, 54

Joren v. Napolitano, 633 F.3d 1144 (7th Cir. 2011) ...........................................41

Kaswatuka v. United States Dep't of Homeland Sec.,
    7 F.4th 327 (5th Cir. 2021) ............................................................................41

Kearney v. Town of Wareham, 316 F.3d 18 (1st Cir. 2002) .............................26

Kloeckner v. Solis, 568 U.S. 41 (2012) ........................................................... 45, 48

Leocal v. Ashcroft, 543 U.S. 1 (2004) ................................................................. 49

Maine Cmty. Health Options v. United States, 140 S. Ct. 1308 (2020) .......... 56

Marrero v. Goya of P.R., Inc., 304 F.3d 7 (1st Cir. 2002) .................................. 68

Martínez v. Novo Nordisk Inc., 992 F.3d 12 (1st Cir. 2021) ............................ 36

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ................................ 27

McGrath v. Mukasey, No. 07 CIV. 11058(SAS),
   2008 WL 1781243 (S.D.N.Y. Apr. 18, 2008) .................................................. 50

Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5 (1st Cir. 1990) ..... 26

Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers,
   619 F.3d 1289 (11th Cir. 2010) .................................................................... 57

Mission Critical Sols. v. United States, 91 Fed. Cl. 386 ................................... 57

Morales-Vallellanes v. Potter, 605 F.3d 27 (1st Cir. 2010) .............................. 67

Murray v. Kindred Nursing Centers W. LLC, 789 F.3d 20 (1st Cir. 2015) .... 25

Noviello v. City of Bos., 398 F.3d 76 (1st Cir. 2005) ........................................ 25

Palmquist v. Shinseki, 689 F.3d 66 (1st Cir. 2012) .......................................... 67

Paul v. Murphy, 948 F.3d 42 (1st Cir. 2020) ..................................................... 37

Ponte v. Steelcase Inc., 741 F.3d 310 (1st Cir. 2014) ....................................... 28

Radzanower v. Touche Ross & Co., 426 U.S. 148 (1976) ................................. 56

Ríos-Jiménez v. Principi, 520 F.3d 31 (1st Cir. 2008) ........................... 61-62, 64

Rivera-Aponte v. Restaurant Metropol #3, Inc.,
    338 F.3d 9 (1st Cir. 2003) .................................................................................37

Rivera-Aviles v. U.S. Dep't of Just.,
    No. 12–1063 (JAG), 2013 WL 4806513 (D.P.R. Sept. 5, 2013) ............... 48, 51

Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77 (1st Cir. 2018)............32

Roberts v. U.S. Dep't of Just., 366 F. Supp. 2d 13 (D.D.C. 2005) .. 43-44, 48, 50

Ryon v. O'Neill, 894 F.2d 199 (6th Cir. 1990) ........................................ 43-44, 48

Santiago-Ramos v. Centennial P.R. Wireless Corp.,
    217 F.3d 46 (1st Cir. 2000) ...............................................................................27

Taylor v. F.A.A., No. CIV. A.,
    87-0652-Z, 1994 WL 129594 (D. Mass. Mar. 30, 1994)...................................48

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) .......................27

Theidon v. Harvard Univ., 948 F.3d 477 (1st Cir. 2020) ........................... 33-34

Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002)......................63

Traynor v. Turnage, 485 U.S. 535 (1988) .............................................................59

United States v. Fausto, 484 U.S. 439 (1988).......................................................43

United States v. Henry, 848 F.3d 1 (1st Cir. 2017) ..................................... 32, 68

United States v. Novak, 476 F.3d 1041 (9th Cir. 2007)....................................57

United States v. Ramírez-Frechel, 23 F.4th 69 (1st Cir. 2022) ........................60

vi

United States v. Zannino, 890 F.2d 1 (1st Cir. 1990)........................................32

Velazquez-Ortiz v. Vilsack, 657 F.3d 64 (1st Cir. 2011) ............................ 25-26

White v. Sec'y Dep't Homeland Sec.,
    478 F. App'x 587 (11th Cir 2012) ............................................... 40, 41

Wilkins v. Johnson, 589 F. App'x 191 (4th Cir. 2015)......................................41

Wilkins v. Napolitano, 2014 WL 5365650 (D.S.C. Oct. 21, 2014)...................41

Zachariasiewicz v. DOJ, 48 F.4th 237, (4th Cir. 2022) ............................... 48, 54

## FEDERAL STATUTES

5 U.S.C. § 1101 *et seq.*...................................................................................42

5 U.S.C. § 1212(a)(2) ....................................................................................48

5 U.S.C. § 1214............................................................................................50

5 U.S.C. § 1214(a)(3) ....................................................................................48

5 U.S.C. § 1221............................................................................................50

5 U.S.C. § 1221(a) .........................................................................................48

5 U.S.C. § 2302............................................................................................55

5 U.S.C. § 2302(a)(2)(A)(iii) .........................................................................54

5 U.S.C. § 2302(b)........................................................................................44

5 U.S.C. § 2303............................................................................................50

5 U.S.C. § 2303(c) ...................................................................................50

5 U.S.C. § 2304................................................................................ 42, 59

5 U.S.C. § 2304(a)(2) ...............................................................................53

5 U.S.C. § 7512...................................................................... 44, 50, 54-55

5 U.S.C. § 7513.........................................................................................44

5 U.S.C. § 7513(d) ...................................................................................50

5 U.S.C. § 7702.........................................................................................45

5 U.S.C. § 7702(a) ...................................................................................50

5 U.S.C. § 7703(b)(1) ........................................................................ 44, 48

5 U.S.C. § 7703(b)(2) ........................................................................ 45, 50

6 U.S.C. § 552(d).......................................................................................39

6 U.S.C. § 557...........................................................................................39

18 U.S.C. § 3231.........................................................................................1

28 U.S.C. § 1291..........................................................................................1

29 U.S.C. 791.............................................................................................46

29 U.S.C. § 794a.......................................................................................56

42 U.S.C. § 200e(k)...................................................................................27

42 U.S.C. § 2000e-2(a)(1) .......................................................................26

49 U.S.C. § 114(b)...........................................................................................39

49 U.S.C. § 44935.................................................................................. 39, 56

49 U.S.C. § 44935(e)........................................................................................58

49 U.S.C. § 44935(e)(2) ....................................................................................3

49 U.S.C. § 44935(e)(2)(A) ............................................................................59

49 U.S.C. § 44935(f)(1)................................................................................3, 59

49 U.S.C. § 44935(f)(1)(B).............................................................................58

Civil Service Reform Act, Pub. L. No. 94-454, 92 Stat. 1111 (1978)...............15

Public Law 107-71, 115 Stat. 597......................................................................38

## FEDERAL RULES

Fed. R. App. P. 4(a)(1)(B)....................................................................................1

## FEDERAL REGULATIONS

25 C.F.R. § 1800.1(c)(1)....................................................................................48

29 C.F.R. § 1630.2(h)........................................................................................63

29 C.F.R. § 1630.2(h)(1) ...................................................................................62

29 C.F.R. § 1630.2(i)..........................................................................................63

49 C.F.R. § 1500.3.............................................................................................39

## **<u>OTHER AUTHORITIES</u>**

EEOC Compliance Manual, Vol.2, EEOC Order 915.002, § 902.2(c)(3) ........64

x

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction. 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

After the district court entered final judgment granting the government summary dismissal (DE 146, 164), plaintiff-appellant Almaris Serrano-Colón timely appealed. (DE 164-66).[1] Fed. R. App. P. 4(a)(1)(B).

---

1.    References to the record will be as follows: DE (Docket Entry or Entries in District Court Civil Case No. 16-1286 (SCC)); AB (Appellant Brief); Add. (Appellant Addendum); AA (Appellant Appendix).

STATEMENT OF THE ISSUE ON APPEAL

**Did the district court err in granting the government's motion for summary judgment when Serrano did not establish a genuine issue of material fact as to any of her Title VII and preempted Rehabilitation Act claims?**

**STATEMENT OF THE CASE**

## I.    The Transportation Security Administration (TSA)

The TSA is an administrative agency of the U.S. Department of Homeland Security (DHS) that oversees the security of domestic and international transportation systems within the United States, including airport security. (AA 200 n.1). To achieve its goals of mitigating threats to aviation security, TSA employs Transportation Security Officers (TSOs) responsible for screening passengers and their property at designated airport security checkpoints nationwide. (AA 204). This includes conducting pat-downs of passengers of the same gender. (AA 2).

Besides the minimum job qualifications set forth by the Aviation and Transportation Security Act (ATSA) , *see, e.g.*, 49 U.S.C. §§ 44935(e)(2), (f)(1), the TSA Administrator requires TSOs possess the ability to repeatedly lift and carry items weighing up to 70 pounds, maintain the physical agility to ensure the ability to squat and bend, and be able to walk up to two miles during a shift and to stand for prolonged periods of time. (AA 2, 204).

## II.   TSA Attendance Policies

Pursuant to TSA policy, TSOs are required to request scheduled

absences at least 7 days in advance. (AA 205). Absent an emergency, unscheduled absences require notice at least 60 minutes in advance. (AA 205). Requests for absences without pay require prior approval. (AA 205).

TSA policy further establishes an employee can be considered absent without leave (AWOL) when she fails to furnish the required administratively acceptable documentation in support of an unauthorized absence. (AA 205-06). Moreover, an employee can be placed on AWOL status when he or she has fails to report to duty without approval, has an unauthorized absence during the workday, or has been absent without providing proper notification. (AA 206). Although not a disciplinary sanction, AWOL may serve as a basis for disciplinary action. (AA 206).

### III.    TSA Hires Serrano as a TSO

After being hired by TSA, Serrano began working as a part-time TSO at the Mercedita/Ponce International Airport (Ponce Airport) in Puerto Rico on October 14, 2007. (AA 204). During Serrano's tenure, TSA's screening operations at the Ponce Airport were limited to a single checkpoint with two lanes. (AA 2). Ten TSOs were ordinarily scheduled for every shift to conduct the screening of approximately 200-400 passengers. (AA 2-3). During

various points throughout Serrano's employment, TSA also had a shortage of female TSOs. (AA 2).

Serrano was a single mother with two children, a fact known to Transportation Security Manager Richard Maldonado since 2008. (AA 204). In 2008, Serrano filed Family and Medical Leave Act (FMLA) paperwork stating that she had been diagnosed with fibromyalgia; her doctor informed that flare ups of her fibromyalgia may cause Serrano to miss a few days of work once or twice a month. (AA 290; DE 109-1 at 74).

Serrano's work schedule consisted of five workdays, followed by two consecutive off days. (AA 204). From 2009 to April 2010, however, Serrano was permitted to work on a flexible schedule consisting of four workdays and three days off. (AA 40-41, 204). This flexible schedule was terminated after the TSA scheduling officer informed management at the Ponce Airport that it did not comply with the agency's scheduling guidelines. (AA 40-41).

Nevertheless, from 2010 to 2015, Serrano's supervisor granted her numerous leave requests so she could attend to personal needs or take vacations. (AA 205). Serrano was also twice allowed to participate in TSA's voluntary leave recipient program, through which other TSA employees

could donate leave time to her. (AA 205).

## IV.    Serrano's Attendance Issues

This notwithstanding, Serrano maintained a poor attendance record and did not consistently follow TSA's attendance policy. (AA 206). For instance, from January to June 2010, Serrano requested ten unscheduled absences, six of which were while on a flexible work schedule. (AA 206). Four of those unscheduled absences fell on the day before or on the day immediately after her off days. (AA 206).

As a result, in July 2010, Supervisory Transportation Security Officer Lyanne Díaz gave Serrano a non-disciplinary Letter of Counseling. (AA 206). The letter highlighted Serrano had to arrive on time to her assigned shift and cautioned Serrano could be placed on leave restriction or face disciplinary action, including removal, if further unexcused absences occurred. (AA 206).

After the letter of counseling, Serrano accumulated three more unscheduled absences. (AA 207). On all three occasions, she failed to notify her supervisor at least 60 minutes prior to the start of her shift that she would not be coming in. (AA 207). Serrano called off of work five more times during the following pay period and was charged AWOL. (AA 207). Serrano sent

an after-the-fact letter explaining she was absent during those five days for
medical reasons but did not include any supporting medical evidence or
documentation. (AA 207). Thus, management informed Serrano the AWOLs
would not be removed from her record. (AA 207).

In total, between October and November 2010, Serrano accumulated
11 unscheduled absences, 3 of which fell on the day immediately before or
immediately after her off days. (AA 207). During that time, she was also late
to work once. (AA 207). So Managers Layda Rodríguez and Myriam
Rodríguez issued Serrano a Letter of Leave Restriction, warning her that
further unapproved absences could be charged as AWOL and form the basis
for administrative action, including removal. (AA 208). A Letter of
Reprimand was issued in January 2011. (AA 208).

Then, on January 18, 2011, Serrano sent an email to Manager
Maldonado and Supervisor Díaz requesting a flexible schedule. (AA 41).
Serrano did not mention her medical condition in her e-mail. After receiving
an e-mail stating such requests should be submitted to the main offices,
Serrano sent her reasonable accommodation request to TSA Headquarters.
(AA 40-41). On October 13, 2011, the TSA Reasonable Accommodation

Program manager denied Serrano's accommodation request, citing the lack of medical documentation from a treating physician certifying any restrictions on Serrano's ability to perform her TSO duties. (AA 41-42). The medical documentation stated Serrano only needed time off for medical appointments. (AA 41-42).

Thereafter, in 2011, Serrano filed a formal complaint with the Equal Employment Opportunity Commission (EEOC) claiming discrimination based on disability. (AA 208). The EEOC denied Serrano's later request to amend the complaint. (AA 208).

While the EEOC complaint was still pending, a reduced work schedule option was made available to all TSOs at the Ponce Airport. (AA 49). Serrano was on this reduced work schedule from June 3, 2012, to February 9, 2013, during which time she accumulated 61.75 hours of leave without pay, and used 23 sick leave hours. (AA 49).

## V.     Serrano's Forged Attendance Records and More Attendance Issues

In May 2012, while the EEOC claim was still pending, another TSO informed Manager Maldonado via letter that Serrano was in a relationship with a Lead TSO and that, with his aid, she would alter her attendance

record in the TSA's time-keeping system if she arrived late to work. (AA 208; DE 96 at 16). Ultimately, in November 2013, Serrano was charged with submitting inaccurate time and attendance reports, chronic lateness, and failure to follow instructions. (AA 209). While the management team opted for removal, Serrano appealed to an internal TSA board, which reduced her removal to a 15-day suspension. (AA 209).

Serrano's attendance issues persisted throughout 2014 and 2015. Supervisor Díaz consulted with Manager Maldonado for guidance on these attendance issues. (AA 211). Ultimately, Serrano was issued three letters of sick leave restriction in seven months. (AA 209-210). The May 2014 letter related to eleven unscheduled absences, four of which Serrano did not report more than 60 minutes prior to the start of her shift, and seven tardiness instances from October 2013 to May 2014. (AA 209, AA 18). The January 2015 letter pertained to ten unscheduled absences between August 2014 and January 2015, seven of which Serrano did not report more than 60 minutes before the beginning of her shift. (AA 209). In this letter, Serrano was informed she would have to provide medical documentation for unscheduled absences due to sudden illness and warned that failure to do

so could result in an AWOL designation and disciplinary action, including removal. (AA 209-10).

In March 2015, Serrano informed Supervisor Díaz she was pregnant and due in late November 2015. During her pregnancy, Serrano was placed in light work positions that allowed her to remain seated and did not involve heavy lifting. (AA 211). Notwithstanding this accommodation, her attendance problems persisted, and she was issued a third letter of sick leave restriction in July 2015 after accruing 30 unscheduled absences from January 2015 to June 2015, twenty of which Serrano did not report at least 60 minutes prior to the start of her shift. (AA 210, AA 25).

## VI.  Serrano's Removal

Finally, because of her continued attendance issues and non-compliance with TSA's attendance policies, on July 26, 2015, Serrano was issued a Notice of Proposed Removal. (AA 213). The notice charged that Serrano failed to request numerous unscheduled absences at least 60 minutes prior to the start of her shift and did not follow instructions insofar as she did not notify her supervisor when she needed to take unscheduled leave. (AA 213). And several unscheduled absences had been deemed

AWOL because Serrano failed to provide supporting medical documentation. (AA 210, 213). The notice also charged that Serrano arrived late for work on numerous occasions. (AA 213).

In response, Serrano contended she had a disability with symptoms that had been exacerbated by her pregnancy making her absences and late arrivals unavoidable, but did not provide any medical reason addressing her failure to notify management at least 60 minutes in advance. (AA 213). Serrano further alleged the attendance-related actions taken against her constituted discrimination because they were purportedly motivated by her pregnancy and/or disability. (AA 213).

Assistant Federal Security Director (Assistant Director) José Rivera removed Serrano from federal service in late August 2015. (AA 213). This was consistent with Assistant Director Rivera's removal of another TSO, a male with no disabilities, for attendance issues. (AA 49-50). Much like Serrano, the male TSO failed to maintain a regular work schedule by seeking unscheduled absences on 16 separate occasions, many of which were immediately before or after his regular days off of work; was tardy on 14 occasions; and he failed to follow leave procedures when he requested

11

unscheduled leave on three separate occasions less than 60 minutes before the start of his shift. (AA 49-50). And like Serrano, the male TSO had a prior disciplinary history that included a 30-day suspension for failing to follow TSA's standard operating procedures, a letter of counseling for engaging in conversation while operating an x-ray scanner, and numerous corrective actions related to his attendance. (AA 49-50). The corrective actions entailed two letters of reprimand, three leave restrictions, and a letter of counseling. (AA 49-50).

## VII.  The 2015 EEOC Complaint

Serrano then filed an EEOC complaint, asserting that she was subjected to harassment or disparate treatment on the basis of sex, disability (fibromyalgia), parental status, or her prior 2011 EEOC claim, and that she was denied a reasonable accommodation for her disability due to (1) her absences between January 2015 and August 2015 deemed AWOL; (2) the denial of her reduced work schedule request from December 2014 to July 2015; (3) the denial of her sick leave or LWOP request in March 2015; (4) the sick leave restriction issued by management in January 2015; (5) being required to justify her absences with medical documentation from August

12

2014 to August 2015 when the same was not allegedly expected of her co-workers; (6) the denial of her advanced sick leave request on April 23, 2015; and (7) her removal on August 24, 2015. (AA 53).

## VIII. Serrano Files Suit Against TSA

In February 2016, Serrano filed this suit in federal court asserting claims under Title VII, the Rehabilitation Act, the Administrative Procedures Act (APA), the Fifth Amendment, and the Puerto Rico Civil Code. (DE 1; DE 24). Serrano averred that, from 2008 to 2011, she was denied reasonable accommodations for her disability (fibromyalgia), encountered roadblocks to obtain FMLA leave, and had number of absences wrongly marked as AWOL. (AA 201). Moreover, from 2013 to 2015, Serrano contended that TSA management denied her reduced schedule requests, placed her on sick leave restriction requiring her to provide medical documentation to support such requests, did not give her advanced sick leave or leave without pay and coded her AWOL, and eventually terminated her. (AA 202-02). According to Serrano, such actions constituted discrimination based on disability, gender and parental status, and retaliation for her EEO activity. (AA 202).

## IX.   Government Moves for Summary Judgment

After discovery, the government moved for summary judgment, maintaining that Serrano could not establish a *prima-facie* case under Title VII. (DE 98). First, of the protected classes raised by Serrano, only gender and parental status were covered under Title VII. (*Id.* at 20-21). Moreover, Serrano had failed to perform her duties in a satisfactory manner given her repeated violations of TSA's attendance policy. (*Id.* at 21-22). And Serrano's cited management actions did not constitute adverse actions. (*Id.* at 22-25). Finally, Serrano was not similarly situated to her alleged comparators. (*Id.* at 25-26). But even assuming she could make a *prima-facie* case, "TSA had legitimate, non-discriminatory [and non-pretextual] reasons for the actions [Serrano] purports to challenge." (*Id.* at 27).

The government also averred Serrano's Rehabilitation Act claims were precluded by the ATSA and not cognizable under binding precedent. (DE 98 at 36-42). And even if not precluded, they failed on the merits because Serrano's 2011 reasonable accommodation request due to her fibromyalgia was denied "because her treating physician certified that she could work without any restriction and did not note any impairments substantially limiting a major life activity." (DE 98 at 45). Furthermore, Serrano was not a

qualified individual with a disability and no adverse actions were taken based on her fibromyalgia. (DE 98 at 45-47).

Additionally, the government averred Serrano's due process and equal protection claims were precluded and lacked merit. (DE 98 at 55-60). Finally, Serrano's remaining federal-law claims were preempted by the Civil Service Reform Act, Pub. L. No. 94-454, 92 Stat. 1111 (1978). (DE 95-96, 98).

Serrano opposed, claiming her gender and parental status claims, as well as her reasonable accommodation claim as it related to her pregnancy, were cognizable under Title VII. (DE 111 at 30-32). Moreover, she averred she performed her duties in a satisfactory manner when she attended her job and claimed the government's claim to the contrary based on her frequent absences ignored such absences would not have been an issue had she been granted the requested reasonable accommodations. (*Id.* at 32-34).

Furthermore, Serrano claimed management engaged in adverse actions by keeping her in "a consistent status of leave restriction" by purportedly refusing to consider her medical issue. (DE 111 at 34-40). Serrano then mentioned two other TSOs as comparators, claiming they were similarly situated to her, yet had not been required to provide medical

documentation to justify their absences. (*Id.* at 40-42). Moreover, Serrano contended the government could not prove its actions against her were non-pretextual. (*Id.* at 42-57).

Serrano maintained her Rehabilitation Act claims were not precluded by binding precedent, noting the Civil Service Reform Act was later amended to allegedly cover TSA employees. (DE 111 at 57-62). She further asserted she could establish a *prima-facie* discrimination case under the Rehabilitation Act and the government's actions were pretextual. (DE 111 at 62-87).

Serrano contended her APA, due process, and equal protection claims were valid. (DE 111 at 87-93).

## X.    District Court Partially Grants Summary Dismissal

The district court granted in part and denied in part the government's motion for summary judgment. (AA 200-31). First, the district court denied summary judgment as to Serrano's Title VII claim based on sex, parental status, and pregnancy. (AA 217-21). Regarding the four elements of a *prima-facie* case, the district court found Serrano was a woman who had been removed from her employment. Moreover, the district court concluded there

were comparable persons who "continued to perform [Serrano's] work responsibilities." (AA 219). It also concluded, however, the government had proffered "a legitimate, nondiscriminatory reason for the adverse employment action: that she had chronic attendance issues and repeatedly failed to follow TSA attendance policy." (AA 219-20).

In determining whether the government's reason was pretextual, the district court stated Serrano had "presented evidence that she consistently provided administratively-sufficient documentation for her absences of three days or more" and "ha[d] sworn under oath that she heard negative comments made about her pregnancy while at work." (AA 220). In light of these findings, and viewing the record most favorably to Serrano, the district court concluded the evidence was "sufficient to raise a genuine issue of fact as to whether her attendance record was a pretext" for Serrano's termination. (AA 220). Thus, it denied the government's motion for summary judgment as to Serrano's Title VII claims. (AA 221).

Meanwhile, the district court dismissed Serrano's claims under the Rehabilitation Act and the APA. While not explicitly addressing whether the Rehabilitation claims were preempted, the district court noted Serrano

"never pursued the route for administrative relief outlined by the Civil Service Reform Act, including seeking review of her removal by the Merit System Protection Board and appealing to the Federal Circuit, …. and she may not now invoke its protections at the summary judgment phase." (AA 222). Moreover, it concluded Serrano's APA claims were precluded by the Civil Service Reform Act. (AA 222-225).

Similarly, the district court concluded Serrano's constitutional claims were not colorable. (AA 226). Based on this, the district court also dismissed with prejudice Serrano's claims against Manager Maldonado in his individual capacity. (AA 229-231).

Only Serrano's Title VII claims survived the district court's ruling.

## XI.    Motions for Reconsideration

Unconvinced, the government moved for reconsideration of the reasoning regarding Serrano's Title VII claim. (AA 232-257). The government maintained Serrano had failed to establish a *prima-facie* case of sex discrimination because, contrary to what the district court had found, Serrano did not prove she had performed her job satisfactorily. (AA 233-38). Alternatively, Serrano failed to carry her burden of proof at the pretext stage,

*i.e.*, the proffered inadmissible and insufficient evidence to demonstrate the government's reasons for terminating her employment were pretextual. (AA 238-251). Serrano moved to reconsider the dismissed claims. (AA 258-83).

## XII.  District Court Grants Summary Dismissal in its Entirety

On reconsideration, the district court acknowledged it had erred in its analysis of Serrano's *prima-facie* case under her Title VII claim. (AA 292). It also recognized its "decision on pretext [wa]s not supported by the undisputed facts, …. and [its] decision on animus [wa]s incorrect under First Circuit caselaw." (AA 293).

Regarding Serrano's burden of establishing a *prima-facie* case of discrimination based on sex, the district court explained that contrary to its earlier finding, Serrano "ha[d] not provided evidence showing that she performed her job satisfactorily" in light of her persistent absenteeism and failure to follow TSA's attendance policy. (AA 296). And Serrano had also failed to bring forth any evidence, besides her own conclusory allegations, supporting her contention that a reasonable accommodation would have allowed her to perform her job satisfactorily. (AA 298-299). Furthermore, Serrano had failed to point out any comparator "who had an attendance

record as poor as her own." (AA 301).

Beyond that, the district court also explained the government had carried its burden of producing a legitimate, nondiscriminatory reason for her termination. (AA 301-02). Specifically, the government produced evidence, such as the letters of counseling and leave restriction sent to Serrano, "showing that they disciplined her because she was consistently absent from and late to work and failed to follow TSA procedures." (AA 302). And Serrano had not shown any "weaknesses, implausibilities, inconsistencies, or contradictions in [the government's] proffered legitimate reasons" or that the government did not believe its stated reasons were legitimate. (AA 304).

Finally, the district court explained that Serrano's assertion she had once heard an unidentified "them" saying, "There she comes. Now she's pregnant," fell short of establishing discriminatory animus. Not only had Serrano not identified the speakers, but such isolated remarks by themselves were insufficient to show discriminatory intent. (AA 306). Thus, the district court granted summary judgment to the government on Serrano's Title VII discrimination claim. (AA 306).

Serrano's Title VII retaliation claim suffered the same fate. Even assuming to Serrano's benefit that she had established a *prima-facie* case of retaliation, the district court concluded the government had carried its burden of showing it had a legitimate, nondiscriminatory reason for denying her leave requests. (AA 310). And Serrano failed to provide any evidence to show the government's proffered reasons were pretextual or motivated by retaliatory animus. (AA 310). Thus, the district court granted summary judgment to the government as to Serrano's Title VII retaliation claim. (AA 312).

Finally, although on different grounds than before, the district court reaffirmed its granting of summary judgment to the government on all of Serrano's discrimination, failure to accommodate, hostile work environment, and retaliation claims under the Rehabilitation Act. (AA 313-25). Meanwhile, the district court declined to reconsider Serrano's due process claim. (AA 325-27).

Accordingly, the district court granted summary judgment to the government on Serrano's Title VII claims and her Rehabilitation Act claims,

and dismissed without prejudice Serrano's claims under Puerto Rico law. (AA 327-28). This appeal ensued.

## SUMMARY OF THE ARGUMENT

Summary judgment for the government was proper as to all of Serrano's Title VII (pregnancy) and Rehabilitation Act (disability/fibromyalgia) claims. Indeed, Serrano's claims falter at all stages of the *McDonnell Douglas* burden-shifting framework. For starters, as the district court found and the record shows, Serrano failed to carry her burden of establishing a *prima-facie* case as to each claim. Moreover, the government proffered a legitimate, non-discriminatory and non-retaliatory reason for denying leave requests and for Serrano's ultimate termination. Specifically, her long history of chronic absenteeism and non-compliance with TSA attendance and reporting policies. And Serrano altogether failed to set forth any evidence to demonstrate the government's proffered reasons were pretextual and to cover up any discriminatory or retaliatory animus.

Regarding Serrano's Rehabilitation Act claims, these are precluded by the ATSA and this Court's precedent. And contrary to Serrano's assertion, the Whistleblower Protection Enhancement Act (WPEA) — which was enacted after this Court held that the ATSA precluded TSA employees from

filing Rehabilitation Act claims — did not supersede or override the ATSA's preclusive effect.

In any event, Serrano's Rehabilitation Act claims fail on the merits. For largely the same reasons applicable to Serrano's Title VII claims, Serrano's failure-to-accommodate claim under the Rehabilitation Act suffers the same fate. Not only has she failed to show she suffers from a qualified disability and she was able to carry out the functions of her job, with or without a reasonable accommodation, she has also failed to show the government's refusal to grant any further accommodations was an adverse employment action.

Finally, although her complaint in the district court included claims under the APA, and the due process and equal protection clauses of the Constitution, Serrano does not challenge the district court's dismissal of these claims on appeal. Nor does she challenge the district court's dismissal of her state law claims. Thus, these claims have been waived.

For the above reasons, this Court should affirm the district court order granting summary judgment for the government.

ARGUMENT

I.    **The district court properly granted the government's motion for summary judgment because the evidence did not establish a genuine issue of material fact as to any of Serrano's Title VII and preempted Rehabilitation Act claims, Serrano failed to establish a *prima-facie* case, and in any event failed to show the government's proffered reasons for termination were pretext.**

## Issue

Serrano contends the district court erred in granting summary judgment for the government. (AB 17-46). The record proves otherwise.

## Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*, "scrutiniz[ing] the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Murray v. Kindred Nursing Centers W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting *Noviello v. City of Bos.*, 398 F.3d 76, 84 (1st Cir. 2005)). It will affirm if the record, viewed in such a manner, "reveals no genuine issue of material fact and demonstrates that the movant is entitled to judgment as a matter of law." *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 70 (1st Cir. 2011). A genuine issue of material fact arises when a nonmovant presents "definite,

competent evidence" that, if credited, could lead "a factfinder [to] resolve the case in favor of the nonmovant." *Id.* (quoting *Kearney v. Town of Wareham*, 316 F.3d 18, 22 (1st Cir. 2002)).

In assessing whether there is an issue of material fact, courts pay short shrift to "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## **Discussion**

### **A. Serrano's Title VII Claims**

The government is entitled to summary judgment on Serrano's Title VII claims. Under Title VII, it is "an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). This prohibition encompasses discrimination "because of or

on the basis of pregnancy, childbirth, or related medical conditions . . . ." 42

U.S.C. 200e(k), as well as parental status, *Chadwick v. WellPoint, Inc.*, 561 F.3d

38, 44 (1st Cir. 2009).

To determine whether a plaintiff's Title VII sex discrimination and

retaliation claims can overcome summary judgment, courts apply a three-

step burden-shifting framework drawn from *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973). At the first step, the plaintiff must make out a

*prima-facie* case of sex discrimination and/or retaliation. A plaintiff

establishes a *prima-facie* case of sex discrimination by showing that "(1) she

belonged to a protected class; (2) she performed her job satisfactorily; (3) her

employer took an adverse employment decision against her, and (4) her

employer continued to have her duties performed by a comparably qualified

person." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st

Cir. 2000). The fourth element has been characterized as "similarly situated

individuals outside [her] protected class were treated more favorably."

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123 (9th Cir. 2000);

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 249 (1981). Meanwhile, a

*prima-facie* case of retaliation entails a showing that the plaintiff "engaged in

protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014).

The second step shifts the burden of production (not persuasion) to the defendant, who must produce evidence the adverse employment actions were taken for a legitimate, nondiscriminatory (or non-retaliatory) reason. *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012); *Ponte*, 741 F.3d at 323. If the defendant offers such justification for the adverse employment actions, then the third step shifts the burden back to the plaintiff, who must then show the proffered reasons were "mere pretext" for unlawful discrimination or retaliation. *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 221 (1st Cir. 2007); *Ponte*, 741 F.3d at 323.

As the district court found, Serrano's Title VII sex discrimination claim failed at the first step because she could not show she was performing her job satisfactorily. As this Court has held, "regular attendance is an essential function of any job." *Benson v. Wal-Mart Stores E., L.P*, 14 F.4th 13, 27 (1st Cir. 2021). And as the district court's factual findings illustrate, from 2010 to 2015, Serrano engaged in a pattern of chronic and continued absenteeism

prompting progressive non-disciplinary warnings and disciplinary measures pre-dating Serrano's pregnancy. Indeed, her abysmal attendance record and utter failure to follow TSA's attendance policy had already contributed to her removal in November 2013 (reduced to suspension), well over a year before Serrano's pregnancy. (AA 209).

After her suspension, Serrano's attendance issues persisted throughout 2014 and 2015 and she was issued three letters of sick leave restriction. (AA 209-210). She accumulated eleven unscheduled absences and seven tardies from October 2013 to May 2014. (AA 209). Then she accrued another ten unscheduled absences between August 2014 and January 2015, seven of which Serrano did not report more than 60 minutes before the beginning of her shift. (AA 209). From January 2015 to June 2015, Serrano had 30 unscheduled absences, 12 of which came on days immediately before or after her regular days off. Moreover, for 20 of the 30 unscheduled absences, Serrano failed to call at least 60 minutes prior to the beginning of her shift. Four of those calls were made at or after her work shift. During this time, Serrano also had eight tardies. (DE 96 at 25).

To refute this, Serrano includes a chart in her opening brief purportedly showing she was able to satisfy TSA's attendance requirement during those periods where she was granted either a reasonable accommodation or allowed to participate in a reduced work schedule option made available to all TSOs at the Ponce Airport. (AB 22). Serrano's table, however, has no record support. For instance, while the table mentions numbers of absences and tardies accumulated during each year of employment, it neglects to mention these were unscheduled absences she often failed to notify her supervisors at least 60 minutes in advance.

For example, while working a 4-day work schedule in January and February 2010, Serrano had six unscheduled absences, three of which she failed to notify with at least 60 minutes before her shift. (DE 96 at 9-10). Then, when again working a 4-day work schedule from June 2012 to February 2013, Serrano accumulated 61.75 hours of leave without pay and used 23 sick leave hours. And although TSA did not grant Serrano's June 2015 request to reduce her hours from 20 to 16, she was nevertheless allowed to take leave every other Wednesday or Thursday in July and August 2015. Despite this,

Serrano consistently required between three and four additional days off from work every pay period. (DE 96 at 38).

Simply put, the record makes clear Serrano cannot establish she performed her job satisfactorily. This dooms her effort to establish a *prima-facie* case of Title VII sex discrimination and this Court need go no further. There being no *prima-facie* case, there is no burden to shift. *Gerald v. Univ. of P.R.*, 707 F.3d 7, 25 (1st Cir. 2013). And dismissal with prejudice was proper because the record is established and would not change by amending the complaint. This Court should therefore affirm the district court's dismissal with prejudice of Serrano's sex discrimination claim under Title VII.

In any event, Serrano also fails at the first step because she has put forward no evidence to satisfy the fourth prong of the *prima-facie* case. Indeed, she makes no developed argument on this front in her opening brief. Rather, she claims that "the last prong is inapposite" because "in 2015, there was not another employee pregnant at her workplace." (AB 45). But the fourth prong is not whether there were others within her protected class that were treated more favorably than Serrano; it's whether there were other similarly situated individuals *outside* her protected class that were treated

31

more favorably. *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88 (1st Cir. 2018). Therefore, Serrano has waived any argument under the fourth prong required to establish a *prima-facie* case of sex discrimination and cannot revive it in a reply brief. *United States v. Zannino*, 890 F.2d 1, 10 (1st Cir. 1990); *United States v. Henry*, 848 F.3d 1, 7-10 (1st Cir. 2017).

Thus, Serrano's sex discrimination claim falters at the first step of the *McDonnell Douglas* framework and this Court should affirm the district court's grant of summary judgment for the government.

Meanwhile, Serrano's Title VII retaliation claim similarly falters at the first step of the *McDonnell Douglas* framework. Given her lackluster attendance record and the lack of similarly situated comparators who were treated more favorably than her, she cannot show a causal nexus between the protected activity (March 2015 EEOC Complaint) and the alleged adverse action (denial of Serrano's post-March 2015 requests for leave and reduced work hours and ultimate termination).

This notwithstanding, even assuming *arguendo* Serrano could establish *prima-facie* cases of Title VII sex discrimination and retaliation, both claims falter at the second and third steps of *McDonnell Douglas* framework. As

32

noted by the district court, the government ably met its burden of production under step two by showing it had legitimate, non-discriminatory (and non-retaliatory) reasons for taking adverse employment actions against Serrano. Specifically, Serrano's long record of absenteeism and failure to follow TSA attendance policy.

As for the third step, Serrano has failed to show that her record of absenteeism and failure to follow TSA attendance policy were mere pretext to cover up any discriminatory or retaliatory animus. "[P]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Theidon v. Harvard Univ.*, 948 F.3d 477, 497 (1st Cir. 2020). "[I]n assessing pretext, [the court's] focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Id.* However, "[m]ere questions regarding [defendant's] business judgment are insufficient to raise a triable issue as to pretext." *Brader v. Biogen, Inc.*, 983 F.3d 39, 56 (1st Cir. 2020) (quoting *Acevedo-*

*Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 140 (1st Cir. 2012) (affirming summary judgment when employer's "merely questionable behavior" did not constitute sufficient evidence of pretext). "[I]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006).

Serrano does not contend these absences did not occur. Rather, she claims that her absenteeism was used as a pretext for her removal because her absences, allegedly, "were directly stimulated by the defendants through the constant refusal to grant reasonable accommodations." (AB 36). But as already explained, *see supra* 30-31, the table in Serrano's opening brief allegedly showing compliance during periods in which she was granted reasonable accommodation has no basis in the record. And Serrano has never explained why she was incapable of timely excusing herself at least 60 minutes before her shifts.

Furthermore, the fact Serrano's performance evaluations did not address her attendance issues is of little moment. If anything, this suggests that the evaluations focused on assessing how Serrano executed her job functions when she was actually in the workplace. And the fact remains Serrano was the subject of progressive disciplinary measures throughout much of her employment. The record is replete with letters of counseling, letters of leave restriction, and letters of reprimand, dating back to 2010 and all the way up to August 2015. Thus, Serrano's attendance issues were well documented, and show a consistent and continuous failure to satisfy TSA attendance policies spanning more than five years.

Moreover, contrary to Serrano's contention (AB 19), her absences were not the "sole" reason for her termination. It was not just that Serrano failed to show up to work, or showed up late; it was that she failed to follow TSA policies regarding reporting or notifying absences, and providing medical documentation supporting her leave requests. Serrano's conclusory assertion she did provide adequate medical documentation is insufficient to establish the government's reason to terminate her was pretextual,

35

particularly where her doctor had said in her original FMLA paperwork she would, at most, only need one or two days per month.

The same holds true regarding Serrano's assertion that "another TSO told her about comments 'they' made, stating 'There she comes. Now she's pregnant.'" (AA 306). For starters, this purported statement from another TSO regarding what an unidentified party said is inadmissible hearsay. "Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). This Court has already held that "statements by nonparties about what other nonparties said or thought cannot suffice to create a genuine dispute of material fact (at least absent a showing that the statements can be presented in a form that would be admissible in evidence)." *Martínez v. Novo Nordisk Inc.*, 992 F.3d 12, 18 (1st Cir. 2021).

Even if this Court were to take this statement into consideration, it is still insufficient to establish pretext or discriminatory animus. Indeed, in her opposition to the government's motion for summary judgment, Serrano admitted that the remarks were open to interpretation. (DE 111 at 51). That dooms her assertion the remark established discriminatory animus because

"a statement that plausibly can be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus." *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 583 (1st Cir. 1999). Additionally, Serrano has never identified who made the discriminatory comment, when it was made, to whom it was made, and in what context. *Rivera-Aponte v. Restaurant Metropol #3, Inc.*, 338 F.3d 9, 12 (1st Cir. 2003) (affirming summary judgment for employer despite claims employer referred to older employees as "imbeciles" and "corpses" where plaintiff never specified who made the comments, when, and to whom); *Paul v. Murphy*, 948 F.3d 42, 54 (1st Cir. 2020) (stray remark without any context cannot support reasonable finding plaintiff was discriminated against).

Accordingly, Serrano has failed to point to specific facts that would demonstrate any sham or pretext intended to cover up a discriminatory or retaliatory motive. This Court should affirm the district court's grant of summary judgment for the government on Serrano's Title VII claims.

## B. Serrano's Rehabilitation Act Claims

Serrano's claims under the Rehabilitation Act are also unavailing. The Rehabilitation Act, a precursor to the Americans with Disabilities Act,

prohibits federal agencies from discriminating against an otherwise qualified employee based on disability. *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 19 (1st Cir. 2004). Although the ADA is not applicable here, "the case law construing the ADA generally pertains equally to claims under the Rehabilitation Act." *Id.*

### 1. Serrano's Rehabilitation Act claim is precluded by the Aviation and Transportation Security Act.

#### a. Preclusive Effect of ATSA's "Notwithstanding" Clauses

The preclusive effect of the ATSA, Public Law 107-71, 115 Stat. 597, on Rehabilitation Act claims brought by members of TSA's airport security screening workforce is well-established. In *Field v. Napolitano*, 663 F.3d 505 (1st Cir. 2011), this Court held that TSA screeners have no cause of action under the Rehabilitation Act due to the preclusive effect of ATSA. Pertinent to the decision were three provisions of ATSA providing broad authority for TSA's employment of security screeners, which apply "Notwithstanding any other provision of law." First, Section 111(d) of ATSA states that:

> [N]otwithstanding any other provision of law, the [Administrator for TSA] [2] may employ, appoint, discipline,

---

2    Although ATSA initially made reference to the "Under Secretary of Transportation for Security" rather than an Administrator as the head of

terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions of the Under Secretary under section 44901 of title 49, United States Code.

*Id*. § 44935 (note). Second, beyond this broad grant, Congress further provided in Section 44935(e)(2)(A) "The Administrator shall establish qualification standards for individuals to be hired by the United States as security screening personnel. *Notwithstanding any other provision of law*, those standards shall require, at a minimum, an individual" to meet several specific qualifications, including "a fitness for duty without any impairment due to illegal drugs, sleep deprivation, medication, or alcohol." In interpreting this second provision, this Court recognized, "[m]ost pertinently, the enumerated qualifications include detailed physical requirements," providing "that security screeners must 'meet, at a minimum, the requirements set forth in [§ 44935] (f).'" *Field*, 663 F.3d at 509. Third, in Section 44935(f)(1) Congress directed TSA screeners possess a series

---

TSA, TSA was later transferred from the Department of Transportation to DHS, *see Durso v. Napolitano*, 795 F. Supp. 2d 63, 66 n.1 (D.D.C. 2011); 6 U.S.C. §§ 552(d), 557; 49 C.F.R. § 1500.3, such that the original title in ATSA – and court decisions interpreting ATSA – effectively discuss or relate to the Administrator for TSA (*see* 49 U.S.C. § 114(b)).

of physical qualifications, including aural and visual perception, the physical strength to manipulate and handle baggage, and the dexterity to perform pat-down searches of individuals, "[n]otwithstanding any other provision of law."[3]

Based on these statutory provisions, this Court first found the standards required for security screeners in ATSA "displace the broader and more general standards of the Rehabilitation Act." *Field*, 663 F.3d at 511. This Court also reached the inexorable conclusion that, in enacting ATSA, Congress meant to "preclude second-guessing of TSA's decisions as to implementing the criteria Congress has established and the discretion as to employment decisions given to TSA." *Id*. at 511-12. Third and finally, ATSA showed a "clear intent to free TSA from the costs and burdens of litigation in federal court over such decisions." *Id*. at 512.

This Court thus concluded that a TSA screener has "no cause of action under the Rehabilitation Act," noting that, "[e]very circuit to address the

---

3    These statutorily-mandated physical qualification standards would ordinarily run afoul of the Rehabilitation Act's prohibition against making employment decisions on the basis of a physical disability. *See White v. Sec'y Dep't Homeland Sec.*, 478 F. App'x 587 (11th Cir 2012).

issue has agreed the language of the ATSA plainly precludes security

screeners from bringing suit under certain of the federal employment

statutes incorporated under Title 5 of the United States Code, including the

Rehabilitation Act." *Id.* at 512, 514. That statement holds true today. [4]

Accordingly, the ability of a TSA screener like Serrano to invoke the

---

[4]    *See, e.g., Field*, 663 F.3d at 512; *Conyers v. Rossides*, 558 F.3d 137, 145 (2d Cir. 2009) (holding that the ATSA's "notwithstanding" clause signals congressional intent to override conflicting provisions of the Administrative Procedure Act); *Coleman v. Sec'y U.S. Dep't of Homeland Sec.*, 649 F. App'x 128, 129-30 n.2 (3d Cir. 2016) (unpublished) ("any claim under the Rehabilitation Act fails as the ATSA precludes [airport security screeners] from bringing claims under that Act against the TSA"); *Wilkins v. Napolitano*, 2014 WL 5365650, at *3 (D.S.C. Oct. 21, 2014) (holding that the ATSA preempts the application of the Rehabilitation Act to TSA screeners), aff'd sub nom *Wilkins v. Johnson*, 589 F. App'x 191 (4th Cir. 2015) (unpublished); *Kaswatuka v. United States Dep't of Homeland Sec.*, 7 F.4th 327, 330 (5th Cir. 2021) ("We therefore agree with the district court that [the plaintiff] cannot proceed with a Rehabilitation Act claim as it is precluded by the ATSA."); *Joren v. Napolitano*, 633 F.3d 1144, 1146 (7th Cir. 2011) ("We now join every other circuit to have considered the question and conclude that the plain language of the ATSA preempts application of the Rehabilitation Act to security screeners."); *White v. Sec'y, Dep't of Homeland Sec.*, 478 F. App'x 587, 588 (11th Cir. 2012) (unpublished) (holding that the Rehabilitation Act is "preempted by the ATSA and fails as a matter of law"); *Conyers v. MSPB*, 388 F.3d 1380, 1382 (Fed. Cir. 2004) ("[T]he '[n]otwithstanding any other provision of law' language renders inapplicable general federal statutes that otherwise would apply to the Under Secretary's power to 'employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service' for screener positions.")

Rehabilitation Act is necessarily limited in light of the requirements Congress imposed upon TSA in hiring its screening workforce and which apply notwithstanding any other provision of law.

### b. The Whistleblower Protection Enhancement Act of 2012 Does Not Reinstate District Court Rehabilitation Actions for TSA Security Screeners.

The clear circuit court precedent holding ATSA precludes Rehabilitation Act claims is not disturbed by the passage of the Whistleblower Protection Enhancement Act of 2012 (WPEA), *codified in relevant part at* 5 U.S.C. § 2304, which modified the application of the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 *et seq.*, to TSA's security screeners. Although WPEA provides certain limited employment protections to TSA security screeners, as the district court recognized, "[p]laintiff never pursued the route for administrative relief outlined by the CSRA." Plaintiff cannot now assert a right to proceed in district court under the Rehabilitation Act.

### i. CSRA and WPEA

The CSRA has long provided "a comprehensive system for reviewing personnel action taken against federal employees," *United States v. Fausto*,

484 U.S. 439, 455 (1988), to the preclusion of other parallel remedies for actions within its scope (including constitutional ones). *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012). The CSRA's preclusive effect applies even to employees who cannot avail themselves of its remedies. *Id.* at 11; *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (noting the CSRA's "comprehensive employment scheme preempts judicial review . . . even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get.") (citation and quotation marks omitted).

The CSRA provides "employees with differing amounts of process depending upon the classification of the employee and the seriousness of the personnel action taken." *Roberts v. U.S. Dep't of Just.*, 366 F. Supp. 2d 13, 18 (D.D.C. 2005). Under the general CSRA framework applicable to certain classes of employees, there are generally "two separate procedures for review of agency actions." *Ryon v. O'Neill*, 894 F.2d 199, 202 (6th Cir. 1990). First, if the employee complains of "prohibited personnel practices" under 5 U.S.C. § 2302(b), "the CSRA requires an employee to first pursue his or her claim with the Office of Special Counsel" (OSC), and then may pursue review with the Merit Systems Protection Board (MSPB), and judicial review

in a court of appeals of competent jurisdiction, to the extent provided by statute. *Roberts*, 366 F. Supp. 2d at 18. In contrast, generally "for serious agency actions ('adverse actions') in response to employee misconduct, the CSRA provides the right to appeal directly" to the MSPB, "with judicial review of the MSPB decision in the Court of Appeals for the Federal Circuit." *Id*. (citing 5 U.S.C. § 7703(b)(1)); *Ryon*, 894 F.2d at 203 (citing 5 U.S.C. § 7513) ("Congress designated more serious agency actions . . . as 'adverse actions' under 5 U.S.C. § 7512, and specified that they be taken only where the government could demonstrate that the employee at whom they were directed had engaged in misconduct, and that the action taken would 'promote the efficiency of the service.'"). For a "mixed case" in which "an employee complains of a personnel action serious enough to appeal to the MSPB [an 'adverse action'] *and* alleges that the action was based on discrimination," the CSRA provides for judicial review of the MSPB's discrimination decision in federal district court. *Kloeckner v. Solis*, 568 U.S. 41, 44-45, 50 (2012) (citing 5 U.S.C. §§ 7702, 7703(b)(2)). This result rests on the employee's entitlement to invoke remedial provisions of various anti-discrimination statutes that may give rise to a mixed case.

The broad authority conferred to the TSA Administrator under ATSA Section 111(d) long meant that members of TSA's screening workforce could not pursue challenges to the MSPB and the Federal Circuit via the CSRA. *Conyers v. Merit Sys. Prot. Bd.*, 388 F.3d 1380, 1382-83 (Fed. Cir. 2004) ("[T]he plain meaning of the 'notwithstanding' clause in section 111(d) of the ATSA fully comports with congressional intent to give [TSA's Administrator] greater flexibility over screener positions vis-à-vis federal laws than he or she has in the case of non-screener positions at TSA.").

The WPEA, enacted in 2012, now provides limited statutory whistleblower and other protections to TSA's screening workforce, through the vehicle of the CSRA's "prohibited personnel practices" regime.[5] Section 2304, entitled "Prohibited personnel practices affecting the Transportation Security Administration," provides in relevant part as follows:

> (a) In general. Notwithstanding any other provision of law, any individual holding or applying for a position within the Transportation Security Administration shall be covered by--

---

[5]    Prior to the enactment of the WPEA, TSA entered into a Memorandum of Agreement with the OSC that permitted TSA screeners to bring whistleblower retaliation allegations to the OSC.  In September 2021, TSA entered into a separate Memoranda of Agreement with the MSPB to allow for adverse action appeals by TSA screeners.

(1) the provisions of section 2302(b) (1), (8), and (9);

(2) any provision of law implementing section 2302(b) (1), (8), or (9) by providing any right or remedy available to an employee or applicant for employment in the civil service; and

(3) any rule or regulation prescribed under any provision of law referred to in paragraph (1) or (2).

Section 2302(b)(1)(D) prohibits discrimination "on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791)." Sections 2302(b)(8) and (b)(9) include whistleblower and other protections.

### ii. TSA screeners who allege disability discrimination claims must proceed through CSRA procedures.

The WPEA affords certain limited administrative procedural protections to TSA screeners. But section 2304 is part of the CSRA and does not purport to overturn or repeal any particular provision of the CSRA, much less any provision of title 49 of the U.S. Code (*i.e.,* the ATSA) that sets forth TSA's personnel management system. As a result, the WPEA only entitled Serrano, a TSA screener who brought a complaint alleging disability discrimination, to raise certain claims administratively to OSC, and

46

thereafter seek additional review before the MSPB and an appropriate court of appeals to the extent provided by law.[6] The WPEA otherwise left undisturbed, however, the longstanding prohibition that prevents Serrano from bringing disability discrimination claims in district court pursuant to the Rehabilitation Act.

Congress included Sections 2304(a)(2) and (3) in the WPEA to address the rights and remedies flowing from the amendment, requiring that "any provision of law implementing section 2302(b) (1), (8), or (9) by providing any right or remedy available to an employee or applicant for employment in the civil service" would be available to TSA screeners like Serrano, as well as "any rule or regulation prescribed under any provision of law" referred to thereunder. The statutory and regulatory provisions implementing §§ 2302(b)(1), (8), and (9), and providing a right or remedy are those that relate to "prohibited personnel practices" and initial submission of such claims to OSC, to include 5 U.S.C. §§ 1212(a)(2), 1214(a)(3), 1221(a), and 7703(b)(1), and 25 C.F.R. § 1800.1(c)(1). *Zachariasiewicz v. DOJ*, 48 F.4th 237,

---

6    The government does not suggest that Serrano is not properly in federal district court for her Title VII claims.

242-44, (4th Cir. 2022) (recognizing, in rejecting Plaintiff's argument that he had brought a mixed case subject to district court review, that a prohibited personnel practice must be challenged with the OSC before the MSPB); *Ryon*, 894 F.2d at 203 ("An employee alleging a prohibited personnel practice is accorded no right to appeal the action directly to the MSPB. Instead, the employee may petition the OSC to investigate his claim"); *Rivera-Aviles v. U.S. Dep't of Just.*, No. 12–1063 (JAG), 2013 WL 4806513, at *5 (D.P.R. Sept. 5, 2013) (internal quotations and citation omitted) ("where a federal employee alleges a prohibited personnel practice, the CSRA provides for review by the OSC[.]"); *Taylor v. F.A.A.*, No. CIV. A. 87-0652-Z, 1994 WL 129594, at *1 (D. Mass. Mar. 30, 1994) (recognizing OSC "has exclusive jurisdiction over claims under 5 U.S.C. § 2302" in the context of a challenge to the employer's alleged failure to accommodate the plaintiff); *Roberts v. U.S. Dep't of Just.*, 366 F. Supp. 2d 13, 18 (D.D.C. 2005); *cf. Kloeckner v. Solis*, 568 U.S. 41, 44 (2012). As a result, the WPEA can only be understood to provide Serrano with the ability to raise certain claims administratively to OSC and the MSPB within the boundaries of the CSRA, and then to seek judicial review in an appropriate court of appeals. The WPEA did not extinguish the otherwise

preclusive effect of the broad notwithstanding language in ATSA discussed above.

Additional language in Section 2304 and surrounding sections further demonstrates that Congress only intended to confer on TSA screeners a statutory right to raise certain claims administratively to OSC, and to seek further review from the MSPB, and judicial review before an appropriate court of appeals as provided by law. *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (noting that, when interpreting a statute, courts generally "construe language in its context and in light of the terms surrounding it"). Section 2304 is titled, "Prohibited personnel practices affecting the Transportation Security Administration," and the section appears in Chapter 23, which pertains to prohibited personnel practices. As explained above, if Serrano sought to challenge the alleged prohibited personnel practices, her path would have begun with OSC, and she could not bypass the attendant CSRA procedures to go directly to federal district court for judicial review. Had Congress intended for the WPEA to confer additional protections, for example those available for "adverse actions" under 5 U.S.C. § 7512 that may lead to federal district court review (as opposed to the "prohibited personnel

49

practices" of Section 2302 that may not form a mixed case subject to federal

district court review),[7] Congress could have used terminology other than

"Prohibited personnel practices," placed the amendment outside of Chapter

23, or otherwise indicated its intent in the text of Section 2304, but did not do

so.[8]

Importantly, Serrano did not avail herself of the CSRA procedures, as

_____

7 *See* 5 U.S.C. § 7513(d); 5 U.S.C. §§ 7702(a), 7703(b)(2).

8      Indeed, Congress made precisely this sort of distinctions in an adjacent provision to Section 2304, 5 U.S.C. § 2303, and court decisions interpreting it indicate that Serrano may not proceed in district court on a Rehabilitation Act claims.  That section is titled, "Prohibited personnel practices in the Federal Bureau of Investigation," and provides as follows regarding enforcement mechanisms: "The President shall provide for the enforcement of this section in a manner consistent with applicable provisions of sections 1214 and 1221 of this title."  5 U.S.C. § 2303(c).  In reviewing this provision and the statutory context of Section 2303, courts have concluded that no judicial review is available to FBI employees alleging prohibited personnel practices thereunder.  *See, e.g.*, *McGrath v. Mukasey*, No. 07 CIV. 11058(SAS), 2008 WL 1781243, at *6–7 (S.D.N.Y. Apr. 18, 2008); *Roberts v. U.S. Dep't of Just.*, 366 F. Supp. 2d 13, 20–21 (D.D.C. 2005).  While the statutory language in Section 2303 is distinct from that of Section 2304, Section 2303(c)'s reference to 5 U.S.C. §§ 1214 and 1221 (which form part of the review scheme discussed above for prohibited personnel practices) is indicative of Congressional intent to limit the remedies for alleged violations of prohibited personnel practices under Section 2304 to OSC, and in certain circumstances, the MSPB and a court of appeals, and to not confer any broader right to judicial review.

she did not file a complaint with OSC and only filed before the EEOC, and has never contended otherwise. As a jurisdictional prerequisite, the CSRA requires that federal employees exhaust the administrative remedies provided therein prior to bringing suit. *Irizarry v. United States*, 427 F.3d 76, 78 (1st Cir. 2005) (affirming dismissal for failure to exhaust administrative remedies provided by CSRA); *Rivera-Aviles*, 2013 WL 4806513, at *5. Given Serrano's failure to seek review of any of the challenged decision with the OSC or the MSPB, her Rehabilitation Act claim should be dismissed for lack of jurisdiction, consistent with the district court's initial opinion and order. (AA 222).

### iii. Serrano's counter-arguments based on the WPEA lack merit.

Serrano's arguments for a more expansive interpretation of the WPEA that would result in full application of the Rehabilitation Act to TSA screeners, including judicial review in federal district court, are untenable for several reasons. First, Serrano's construction would constitute an implicit repeal of the clear notwithstanding language that appears in ATSA (in three separate locations as relevant to the terms and conditions related to TSA security screeners), which courts disfavor. *Hui v. Castaneda*, 559 U.S. 799,

51

809–10 (2010) ("[R]epeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest."). In order to avoid this result, Section 2304 can only be interpreted to afford Serrano the ability to present concerns about a possible prohibited personnel practice, including disability discrimination, to OSC, via the procedures set forth in the CSRA.

Second, the district court correctly dismissed Serrano's Rehabilitation Act claims in its initial opinion and order, recognizing that Serrano "never pursued the route for administrative relief outlined by the CSRA" and "may not now invoke its protections at the summary judgment phase." (AA 223). The district court's subsequent order on reconsideration on this point is dubious. The district court proceeded to the merits of Serrano's Rehabilitation Act claim after recognizing that it appeared Serrano did not exhaust her CSRA remedies, but conversely stating "defendants have not provided conclusive proof that she did not seek review of the TSA's final decision before the MSPB before she filed suit." (AA 317). But as the district court recognized in its initial and reconsideration opinions, Serrano did not pursue administrative remedies under the CSRA, and instead only pursued

an EEOC complaint.

Next, even assuming Serrano exhausted remedies through the CSRA, for all the reasons discussed above, *see supra* § B.1., the district court incorrectly held that Serrano was presenting a mixed case subject to federal district court review. The WPEA explicitly addressed the rights and remedies it created by limiting those remedies to provisions of law "implementing section 2302(b)(1), (8), or (9)." 5 U.S.C. § 2304(a)(2). Those provisions of law and regulations referenced via Section 2304 solely provide Serrano with the ability to seek review by OSC and, in certain circumstances, MSPB and court of appeals review, rather than permitting Serrano to seek review in a federal district court directly under the Rehabilitation Act. Indeed, a prohibited personnel practice alone "cannot form the core of a mixed case" subject to district court review, as "a mixed case can include only those 'serious' personnel actions enumerated in 5 U.S.C. § 7512 that fall within the MSPB's 'original jurisdiction.'" *Zachariasiewicz*, 48 F.4th at 244, 245 (4th Cir. 2022); *Irizarry v. United States*, 427 F.3d 76, 79 n.2 (1st Cir. 2005). As noted, had Congress intended for the WPEA to confer on Serrano the rights and remedies applicable to adverse actions, a required predicate to a mixed

53

case subject to district court review, it could have placed the amendment outside of Chapter 23, not used "Prohibited personnel practices" in the title, and/or explicitly mentioned that TSA screeners would be afforded the rights or remedies implementing 5 U.S.C. § 7512 (the provision concerning adverse actions that may form a part of a mixed case). Those omissions are fatal to the district court's conclusion that the WPEA permitted Serrano, a TSA screener, to bring a mixed case subject to federal district court review.

The analysis is not altered by the fact Serrano challenges an adverse action under 5 U.S.C. § 7512. Section 2302(a) discusses adverse actions and routes their review pursuant to Chapter 75 of Title 5. 5 U.S.C. § 2302(a)(2)(A)(iii) ("personnel action" includes "an action under chapter 75 of this title or other disciplinary or corrective action"). But Section 2304 limits review of personnel actions challenged by TSA screeners to the regime available for "prohibited personnel practices." As discussed above, Congress has generally provided two separate procedures for review of agency actions, one for "prohibited personnel practices" under 5 U.S.C. § 2302 with review for certain challenges before OSC, the MSPB, and a court of appeals, and a separate one for "adverse actions" under 5 U.S.C. § 7512

54

with direct review by the MSPB followed by judicial review. *See supra* § B.1.[9]

By explicitly limiting the rights and remedies under the WPEA to those

implementing Section 2302(b)(1), (8), and (9), and for the additional reasons

discussed above, only the former path is available to Serrano, a former TSA

screener, to the exclusion of the review mechanisms implementing 5 U.S.C.

§ 7512. *Id*.

Fourth, Serrano may not invoke federal district court jurisdiction

pursuant to Section 505 of the Rehabilitation Act. As discussed above, every

circuit to address the issue has agreed that ATSA precludes TSA screeners

from bringing suit under the Rehabilitation Act. And the WPEA does not

change this result, as neither Section 2304 nor Section 2302(b)(1)(D) invokes

section 505 of the Rehabilitation Act (29 U.S.C. § 794a), which provides a

federal court remedy and the ability to bring an action in district court.

Finally, Serrano's argument that the "notwithstanding" provision in

Section 2304 necessarily supersedes the various "notwithstanding"

---

9    The government does not argue that adverse actions under Chapter
75, such as Serrano's removal, may not also constitute personnel actions for
purposes of Sections 2302 and 2304.  But Serrano's ability to proceed in
district court on the complaint she filed alleging disability discrimination
exists, if at all, on the remedies afforded by 2304.

provisions in 49 U.S.C. § 44935 rests on a mistaken understanding of how such provisions are interpreted. Specifically, Serrano's construction goes against the well-settled principle that absent a clear statement by the legislature, courts must regard two laws as effective whenever possible. *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). Even if two provisions do conflict, the "notwithstanding" provision governs only "to the minimum extent necessary" to resolve the conflict between the two statutory provisions. *Radzanower*, 426 U.S. at 155; *In re Glacier Bay*, 944 F.2d 577, 582 (9th Cir. 1991) (noting that when two statutes are partially in conflict, the later statute overrides the former only to the extent necessary to make the later enacted law function). Thus, when considering whether a particular law overrides another, the fact a provision "used the phrase 'notwithstanding any other provision of law' is not dispositive." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1168 (9th Cir. 2007); *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1299 (11th Cir. 2010) ("notwithstanding" clause's "actual reach depends on an analysis of the statutory language relevant to it"). Like

56

any statutory language, courts must construe "the reach of each such 'notwithstanding' clause by taking into account the whole of the statutory context in which it appears." *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007).[10]

In light of these guideposts, and given Section 2304 does not purport to overturn or repeal ATSA or any particular provision of the CSRA, the sole import of Section 2304 is to provide a statutory right to Serrano to raise certain claims to OSC, the MSPB, and a court of appeals. For all these reasons, the WPEA is not sufficient to overrule ATSA's preclusive effect and the clear Court of Appeals precedent.

### iv. The WPEA likewise does not disturb ATSA's physical qualification standards.

---

10    Such considerations include the purpose of the statute and whether Congress intended to create a comprehensive scheme or merely supplement or alter a portion of an existing regime.  *In re Glacier Bay*, 944 F.2d at 582; *Bark v. United States Forest Serv.*, 37 F. Supp. 3d 41, 53 (D.D.C. 2014) (courts construing a "notwithstanding" clause "have been careful to adhere to more general canons of statutory interpretation by applying a 'notwithstanding' clause in context with the rest of the statute in which it appears"); *Mission Critical Sols. v. United States*, 91 Fed. Cl. 386, 398–99, *dismissed*, 452 Fed. Appx. 962 (Fed. Cir. 2010), *enforcement denied on other grounds*, 104 Fed. Cl. 18 (2012) (determining that "notwithstanding" clause in a law that also required compliance with other named laws in another section did not override the laws named in the other part).

Even if this Court adopts Serrano's faulty and overly expansive interpretation of the WPEA, deference must still be accorded to ATSA's specific physical qualifications for screeners. The WPEA cannot be understood to supersede TSA's long-established authority to set TSO physical and psychological qualification standards, as the WPEA does not repeal TSA's Congressionally-mandated responsibility to set and require security screeners to meet certain medical guidelines.

As discussed above, under ATSA, beyond the broad discretion conferred to TSA's Administrator to make personnel decisions regarding TSA's screening workforce, Congress additionally and separately directed that TSA screeners possess certain minimum physical qualifications, including "color perception, visual and aural acuity, physical coordination, and motor skills," "[n]otwithstanding any provision of law." *See* 49 U.S.C. §§ 44935(e), (f)(1)(B). While the WPEA amended the CSRA by providing the protections set forth in 5 U.S.C. § 2304 to TSA screeners, it did not address the TSA screener qualification standards set forth in ATSA Section 111(d) or 49 U.S.C. §§ 44935(e)(2)(A), or (f)(1). By passing the WPEA, Congress made clear its intent to provide TSOs with statutory whistleblower rights and to

include them in the remedial framework of the CSRA notwithstanding any other law. But contrary to Serrano's argument, the WPEA does not negate or repeal Congress's equally clear direction under ATSA establishing physical qualification requirements for TSOs. The general language of the WPEA in no way amends or alters ATSA's specific provisions regarding physical qualifications for TSOs. *See Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (a narrower and more specific law will not be overcome by a later enactment unless the later statute "*expressly* contradicts the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all.").

Further, neither the WPEA nor the CSRA confer more substantive rights under the anti-discrimination statutes than those anti-discrimination statutes provide themselves. Rather, the CSRA is part of "an enforcement scheme" that establishes the *procedure* for, and not the *substance* of, discrimination claims brought under the CSRA. *Borrell v. United States*, 682 F.2d 981, 987 (D.C. Cir. 1982) (holding that Congress did not intend to create a private statutory right of action to enforce restrictions against reprisals for whistleblowing and that the CSRA establishes "detailed enforcement

scheme" to effect the purpose of safeguarding employees from prohibited personnel practices and thereby to insure a "more effective civil service"). And as noted above, the WPEA simply conferred TSA screeners with a statutory right to raise certain claims administratively and then to an appropriate court of appeals of competent jurisdiction. As a result, even if ATSA does not entirely preempt Rehabilitation Act claims in federal district court by TSA screeners, as argued above, deference must still be accorded to the physical qualification standards for TSOs set forth by Congress.

Thus, this Court should affirm the district court's grant of summary judgment for the government on Serrano's Rehabilitation Act claims on preclusion grounds. *United States v. Ramírez-Frechel*, 23 F.4th 69, 73 (1st Cir. 2022) (court may affirm on any basis apparent from the record).

### 2. Serrano's Rehabilitation Act Claims Fail on their Merits

In any event, assuming *arguendo* ATSA preclusion no longer applies, Serrano's discrimination, failure-to-accommodate, and retaliation claims under the Rehabilitation Act fail on the merits.

Regarding Serrano's discrimination and failure-to-accommodate claims, the *McDonnell Douglas* burden-shifting framework requires Serrano

60

first establish "1) she was disabled within the meaning of the statute; [and] 2) she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation." *Ríos-Jiménez v. Principi*, 520 F.3d 31, 41 (1st Cir. 2008). For her discrimination claim, Serrano must also show that "3) the employer took adverse action against her because of the disability." *Id.* As for her failure-to-accommodate claim, Serrano must show her "employer, despite knowing about the disability, did not acquiesce to a request for a reasonable accommodation." *Id.*

If Serrano makes these showings, the burden shifts to the government to "articulate a legitimate, non-discriminatory reason for the employment decision and to produce credible evidence to show that the reason advanced was the real reason." *Id.* If the government does so, the burden shifts back to Serrano to prove "that that the proffered reason is pretext intended to conceal discriminatory intent." *Id.*

As with her Title VII claims, Serrano's discrimination and failure-to-accommodate claims under the Rehabilitation Act fail at the starting gate. She fails to demonstrate she is disabled within the meaning of the Act and that she was qualified to perform the essential functions of the job with or

without reasonable accommodation. Under the Rehabilitation Act, an individual with a disability (1) has a physical or mental impairment that substantially limits at least one major life activity; (2) has a record of such impairment; or (3) is regarded as having such an impairment. And although the Rehabilitation Act does not define physical impairment, the ADA states that it is "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting" one of the following body systems: "neurological, musculoskeletal, special sense organs, respiratory (including speech organs, cardiovascular, reproductive, digestive, genito-urinary, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. 1630.2(h)(1). Meanwhile, EEOC regulations state "major life activities" are those activities the average person can perform with little or no difficulty. 29 C.F.R. 1630.2(i). Moreover, the Supreme Court has stated that "major" means important, but not limited to aspects of a person's life that have a public, economic, or daily character. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002); *Bragdon v. Abbott*, 524 U.S. 624, 638-39 (1998).

Serrano cannot show she suffers from a disability as that term is defined under the Rehabilitation Act. For one thing, federal regulations

under the ADA explicitly exclude pregnancy from being considered a disability. 29 C.F.R. § 1630.2(h). Thus, Serrano's pregnancy in and of itself is not a disability under federal law.

Serrano has also failed to show her fibromyalgia is a disability for purposes of the Rehabilitation Act because, aside from her own self-serving assertions to the contrary, the record is devoid of any evidence this condition substantially limited a major life activity. Indeed, as part of her 2011 request for a reasonable accommodation, her treating physician certified she could work without any restrictions and did not require a flexible work schedule. (DE 98 at 45).[11]

But even if Serrano could show that she suffered from a disability that substantially affected a major life activity, she still cannot show that she was qualified to perform the essential functions of her job, with or without a reasonable accommodation. This Court has already held that a plaintiff

---

[11]     To be sure, "complications" resulting from pregnancy may constitute an impairment. *See* EEOC Compliance Manual, Vol.2, EEOC Order 915.002, § 902.2(c)(3). And Serrano has alleged that her fibromyalgia was exacerbated by her pregnancy. But those bare assertions, without more, are not enough. Thus, Serrano has failed to show she suffers from a disability, as that term is defined for purposes of the Rehabilitation Act.

cannot show she was able to perform the essential functions of her job, either with or without a reasonable accommodation, when she "frequently missed work," and, "importantly, [] had a spotty attendance record even after" she was granted her requested accommodation to work on a part time basis. *See Rios-Jimenez v. Principi*, 520 F.3d 31, 42 (1st Cir. 2008). Such is the case here, where Serrano's attendance issues continued during the time periods where she was on flexible schedules. Because of her unpredictable attendance record and chronic lateness, as well as her failure to follow the simplest of instructions to timely notify supervisors that she would be absent or late at least 60 minutes before the start of her shifts, Serrano was not able to perform her duties. As a result, her co-workers were left to pick up the pieces and travelers faced potential delays.

Moreover, Serrano cannot demonstrate that her employer took adverse actions against her for purposes of her discrimination claim under the Rehabilitation Act. In fact, in 2009-2010, she was granted a flexible work schedule but it had to be terminated because it did not comply with TSA's scheduling guidelines. (AA 40-41, 204). Nevertheless, when the opportunity arose, she was again allowed a flexible work schedule when the option was

made available to all TSOs. (AA 49). But even then, her attendance problems persisted. (AA 49). And Serrano also cannot show that her employer refused her reasonable accommodation despite knowing of her disability because, as already mentioned, the only medical evidence she ever provided from her treating physician certified that she did not need the reasonable accommodations in the form of a flexible work schedule, but rather would need just one or two days a month for flare ups.[12]

For these reasons, Serrano cannot establish a *prima-facie* case of either discrimination or failure-to-accommodate under the Rehabilitation Act. Accordingly, this Court should affirm the district court's order granting summary judgment for the government.

In any event, even if Serrano could satisfy the requisite showings for a prima-facie case, her claims nevertheless fail. Just as it did regarding Serrano's Title VII claims, *see supra* 33, the government provided a legitimate, non-discriminatory reason for denying leave requests and terminating

---

12    Serrano contends that she was treated differently from her co-workers by being required to provide medical documentation justifying her absences. (AA 47). However, the co-workers she pointed to were not similarly-situated because they were not on leave restriction and did not have similar issues. (AA 47).

Serrano and furnished evidence showing that this was the real reason behind Serrano's ultimate termination. And just as she could not do with her Title VII claims, *see supra* 34, Serrano cannot prove that the proffered reason was pretextual.

Finally, Serrano's retaliation claim under the Rehabilitation Act fails because she cannot show that she was subjected to adverse employment action or any causal connection between any alleged adverse action and her protected activity. *See Palmquist v. Shinseki*, 689 F.3d 66, 70–71 (1st Cir. 2012) (quoting *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012). While her 2011 EEOC complaint alleging disability discrimination could be protected conduct, there was no adverse employment action in response to this activity. Her termination did not take place until 2015, a full four years after the complaint was filed. Indeed, the nearest in time "adverse actions" Serrano alleges – the letters of leave restriction – were all issued over a year after the EEOC complaint was dismissed. This is not the "very close" temporal proximity required to establish causation. *See Calero-Cerezo*, 355 F.3d at 25 (noting "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

But in any case, those were not adverse employment actions, but rather non-disciplinary measures that did not carry any significance on their own. Thus, because they did not "materially change" Serrano's employment conditions, *Gu v. Boston Police Dept.*, 312 F.3d 6, 14 (1st Cir. 2002), they did not amount to adverse employment actions. *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) ("A materially adverse change in the terms and conditions of employment 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities'" (quoting *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002))). Accordingly, Serrano has failed to establish a *prima-facie* case of retaliation under the Rehabilitation Act.

Moreover, as with Serrano's other claims, the government provided a legitimate, nonretaliatory reason for its actions: her chronic absenteeism, continued tardiness, and failure to follow procedures. And Serrano cannot point to any evidence showing these proffered reasons were pretextual. Thus, the government was entitled to summary judgment.

Based on all the above, Serrano's Rehabilitation Act claims suffer the same fate as her claims under Title VII. This Court should affirm the district court's order granting the government's motion for summary dismissal.

## A. Serrano's APA, Due Process, and Equal Protection Claims

Finally, while Serrano pressed claims under the Administrative Procedures Act (APA) and due process and equal protection clauses in the district court, on appeal she does not challenge the dismissal of these claims. Nor does she challenge the dismissal of her state law claims. Thus, she was waived any argument that the district court erred in dismissing these claims. *United States v. Henry*, 848 F.3d 1, 7-10 (1st Cir. 2017).

CONCLUSION

For these reasons, this Court should affirm the district court's order granting the government's motion for summary judgment.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 21st day of November 2022.

> W. Stephen Muldrow
> United States Attorney
>
> /s/ Mariana E. Bauzá-Almonte
> Assistant United States Attorney
> Chief, Appellate Division
>
> /s/ Francisco A. Besosa-Martínez
> Assistant United States Attorney
> U.S. Attorney's Office
> Torre Chardón, Suite 1201
> 350 Carlos Chardón Avenue
> San Juan, Puerto Rico 00918
> Tel. (787) 766-5656
> Fax (787) 771-4050

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

**Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ☑ this brief contains <u>13,142</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this brief has been prepared in a proportionally spaced typeface using <u>Book Antiqua</u> in <u>14 point</u>, *or*

   ☐ this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: 11/21/2022            /s/ Francisco A. Besosa-Martínez
                             Signature of Filing Party

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on November 21, 2022, I electronically filed the brief with the Clerk of the Court using the CM/ECF system, which will send notification to all attorneys of record.

/s/ Francisco A. Besosa-Martínez
Assistant United States Attorney